Commercial Iron Works v. Commissioner. John L. Barnes, Transferee, of Commercial Iron Works v. Commissioner. Estate of Cyrus R. Cotton, Deceased, Josephine Gowen Cotton, Executrix, v. Commissioner.Commercial Iron Works v. CommissionerDocket Nos. 8261, 8262, 8265.United States Tax Court1946 Tax Ct. Memo LEXIS 17; 5 T.C.M. (CCH) 1059; T.C.M. (RIA) 46284; December 10, 1946*17 W. J. Knight, Esq., 915 Petroleum Bldg., Houston 2, Texas, for the petitioners. Stanley B. Anderson, Esq., for the respondent. HARLAN Memorandum Findings of Fact and Opinion HARLAN, Judge: These three cases, in which the one of John L. Barnes and that of the Estate of Cyrus R. Cotton involved transferee liability, are all consolidated. In the two transferee liability cases liability is admitted, providing a deficiency is affirmed against Commercial Iron Works. The taxpayers seek a review of deficiencies heretofore determined by the Commissioner for the fiscal year ending February 28, 1942, in the following nature and amounts: Income tax$ 6,476.40Declared value excess profits tax785.36Excess profits tax12,124.77The question presented is as follows: Is petitioner corporation entitled to deduct as ordinary and necessary expense for the fiscal year ending February 28, 1942, a total of $59,500 as salaries paid to its president and vice president for services claimed to have been rendered during the fiscal year ended February 28, 1942, and for services rendered the corporation during prior years, or is petitioner limited to a deduction of*18 $22,500 as compensation to said officers for services rendered during said fiscal year as allowed by the Commissioner? Findings of Fact Taxpayer, Commercial Iron Works, hereinafter referred to as petitioner, had its principal office, prior to dissolution, and now has its mailing address at 6422 Esperson Street, Houston, Texas. It filed its income tax return for the fiscal year ending February 28, 1942, with the collector of internal revenue for the first district of Texas. Petitioner was organized as a corporation under the laws of Texas on February 13, 1936. John L. Barnes and Cyrus R. Cotton each owned 50 percent of its capital stock. Barnes was president and Cotton was vice president. The corporation was engaged in the steel fabricating business which it conducted until April 29, 1942, when it was dissolved and all of its assets transferred to Barnes and Cotton who assumed its liabilities. The payments made as salaries to Barnes and Cotton up to February 28, 1942, and the ratio of total officers' salaries to gross profits of said corporation are as follows: Ratio ofOfficersSalariesFiscalTo GrossJohn L.Cyrus R.YearTotalSalesBarnesCotton2-28-37$3,750.0032%$3,750.002-28-389,200.0036%5,500.00$3,700.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,800.0038%5,400.005,400.002-28-406,300.0025%2,700.003,600.002-28-417,200.0021%3,600.003,600.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,500.0065%40,000.0019,500.00*19 The $40,000 payment credited to Barnes during the fiscal year ending February 28, 1942, contained $3,000 as salary from March 1, 1941 to December 31, 1941, and $5,000 designated as salary from January 1, 1942, to February 28, 1942. The remaining $32,000 was designated as payment for extraordinary services for prior years as authorized by a resolution of the directors consisting of Barnes and Cotton on December 15, 1941. The $19,500 payment to Cotton at the same time consisted of $3,000 back salary from March 1, 1941, $2,500 for January and February, 1942, and $14,000 compensation for extraordinary services during prior years. The resolution of the board of directors of December 15, 1941, reads as follows: 1. BE IT RESOLVED that this corporation pay to John L. Barnes the sum of $32,000.00 as additional compensation for his past services to this company as an officer thereof and in any other capacity, and that for the period from January 1, 1942, his salary be fixed at the rate of $2500.00 per month. 2. BE IT RESOLVED that this corporation pay to Cyrus R. Cotton the sum of $14,000.00 as additional compensation for his past services to this company as an officer thereof and*20 in any other capacity, and that for the period from January 1, 1942, his salary be fixed at the rate of $1250.00 per month. 3. BE IT RESOLVED that this corporation pay to Ira Palmer the sum of $2,250.00 as additional compensation for his past services to this company as an employee thereof, the matter of additional compensation for 1942 being deferred for further consideration. 4. BE IT RESOLVED that this corporation pay to other employees such additional compensation for services rendered to December 31, 1941, as in the opinion of its officers rendered to December 31, 1941, as in the opinion of its officers may be deemed necessary and proper. The full amounts credited to Barnes and Cotton were paid to them prior to April 29, 1942, the date of the dissolution of the corporation, by paying Cotton $8,500 cash and a note for $11,000, and paying Barnes $11,000 cash and two notes for $29,000. At the time of the dissolution of the company these notes were surrendered in exchange for the transfer of the assets to Barnes and Cotton personally. The books of the corporation were kept on an accrual basis. A comparative balance sheet of the corporation up to February 28, 1942, reads as*21 follows: COMPARATIVE BALANCE SHEETASSETS2/28/372/28/382/28/392/29/402/28/412/28/42Current Assets: Cash in Bank and on Hand$ 910.59$ 25.00$ 7,197.66$ 656.26$ 2,238.22$ 6,284.74Accounts & Notes Receiv-able8,546.416,705.7435,949.0718,107.2523,905.9413,240.47Inventories4,165.178,364.326,446.2512,442.9224,649.1733,696.73Other Current Assets345.51443.561,214.911,276.391,217.501,069.87Total Current Assets$13,967.68$15,538.62$50,807.89$32,482.82$52,010.83$54,291.81Fixed Assets: Land$ 1,107.20$ 1,156.00$ 1,156.00$ 1,245.88$ 3,606.74$ 3,606.74Buildings8,224.779,550.5116,874.8117,019.6117,471.4417,886.24Machinery & Equip.5,340.898,552.0817,535.2518,865.6720,307.3422,954.09Office Furniture &Fixtures387.09673.511,205.861,224.261,488.151,686.27Delivery Equipment1,355.111,363.611,363.611,363.612,920.812,962.38Total Fixed Assets$16,415.06$21,295.71$38,135.35$39,719.03$45,794.48$49,095.74Less: Reserve for Depreciation$ 733.40$ 2,388.27$ 4,457.43$ 7,807.08$11,657.80$15,353.41Net Book Value - FixedAssets$15,681.66$18,907.44$33,678.10$31,911.95$34,136.68$33,742.33Total Assets$29,649.34$34,446.06$84,485.99$64,394.77$86,147.51$88,034.14LIABILITIES AND NET WORTHLiabilities: Overdraft - Bank$ 3,505.10Accounts Payable$10,814.368,671.26$31,593.17$19,374.38$30,754.31$ 4,246.47Notes Payable: C. R. Cotton9,200.0013,200.0018,200.0016,650.0018,552.2929,522.29J. L. Barnes2,500.002,500.008,675.3337,675.33Other3,836.973,236.9717,825.1512,236.9715,176.64440.00Total Notes Payable$13,036.97$16,436.97$38,525.15$31,386.97$42,404.26$67,637.62Total Liabilities$23,851.33$28,613.33$70,118.32$50,761.35$73,158.57$71,884.09ASSETSDeferred Income: Prepaid Office Rent$ 845.58Net Worth: Capital Stock$ 5,000.00$ 5,000.00$ 5,000.00$ 5,000.00$ 5,000.00$ 5,000.00Donated Surplus1,117.161,417.161,417.161,417.161,417.16Appreciation Surplus7,943.727,248.956,598.435,879.28Earned Surplus (Deficit)(47.57)(284.43)(6.79)(32.69)(26.65)3,853.61Total Net Worth$ 4,952.43$ 5,832.73$14,367.67$13,633.42$12,988.94$16,150.05Total Liabilities, DeferredIncome & Net Worth$29,649.34$34,446.06$84,485.99$64,394.77$86,147.51$88,034.14*22 A comparative statement of income of petitioner is as follows: 2/28/372/28/382/28/392/29/402/28/41Gross Sales$55,573.07$149,437.03$167,155.32$129,489.31$151,795.68Less: Trade Discounts onSales334.15595.85351.42501.58106.94Net Sales$55,238.92$148,841.18$166,803.90$128,987.73$151,688.74Cost of Goods Sold: Work in Process Inven-tory Beginning$ 457.50$ 788.32$ 64.20$ 1,106.59Materials Used32,238.3985,886.58105,601.9475,171.7894,313.69$Direct Labor4,443.7712,732.1713,530.9211,200.4911,762.79Shop Overhead2,430.268,669.358,136.8211,543.5113,615.46Paint & Linseed Oil262.72887.70961.29810.29950.94Contract Erection Work2,793.9511,683.385,643.882,495.512,051.81Outside Shop Services556.191,025.81812.321,043.671,700.64Engineering & Drafting1,231.412,394.812,607.842,197.153,207.68$43,956.69$123,737.30$138,083.33$104,526.60$128,709.60Less: Work in ProcessInventory - End$ 457.50$ 788.32$ 64.20$ 1,106.59$ 11,133.69Cost of Goods Sold$43,499.19$122,948.98$138,019.13$103,420.01$117,575.91Gross Profit on Sales$11,739.73$ 25,892.80$ 28,784.77$ 25,567.72$ 34,112.83Selling & AdministrativeExpense (Inc. Officers'Salaries)$10,066.71$ 20,654.88$ 24,481.15$ 19,501.48$ 23,536.35Delivery Expense1,255.993,842.431,701.435,434.266,256.12Net Profit before OtherIncome & Charges$ 417.03$ 1,394.89$ 2,602.19$ 631.98$ 4,320.36Net Other Income &(Charges)($ 464.60)($1,631.75)($2,221.74)($866.95)($2,887.89)Net Profit (Loss) per Booksbefore Income Tax($ 47.57)($ 236.86)$ 380.45($ 234.97)$ 1,432.47*23 2/28/42Gross Sales$318,637.78Less: Trade Discounts onSales1,047.05Net Sales$317,590.73Cost of Goods Sold;work in Process Inven-tory Beginning$ 11,133.69Materials Used160,845.54Direct Labor19,161.23Shop Overhead20,244.07Paint & Linseed Oil3,309.70Contract Erection Work8,472.90Outside Shop Services3,833.03Engineering & Drafting3,555.54$230,555.70Less: Work in ProcessInventory-End$6,277.58Cost of Goods Sold$224,278.12Gross Profit on Sales$ 93,312.61Selling & AdministrativeExpense (Inc. Officers'Salaries)$ 76,389.73Delivery Expense7,781.25Net Profit before OtherIncome & Charges$9,141.63Net Other Income &(Charges)($ 3,902.50)Net Profit (Loss) per Booksbefore Income Tax$ 5,239.13Prior to the organization of petitioner, Barnes had had about ten years experience with a steel fabricator and was a capable executive. He devoted all of his time to the company in procuring sales and supervising operations. Cotton was a lawyer of ability and was possessed of substantial means. Both of these men devoted their full time to the operations of the business of petitioner. Cotton rendered*24 special services in collecting accounts, in advising the petitioner on all tax and legal matters and in fortifying the credit of petitioner, either by direct loans to the company or by endorsing loans or charge accounts made by the company. Prior to December 15, 1941, neither Barnes nor Cotton considered themselves underpaid nor did they have any anticipation of being paid any additional compensation for the years 1937, 1938, 1939 and 1940. On December 15, 1942, the date on which Cotton and Barnes, sitting as directors, transferred to themselves $14,000 and $32,000, respectively, for additional compensation for services prior to 1941, they were assured of an exceptionally prosperous year and had prospects of continuing success. Very largely as a result of the efficient management of Cotton and Barnes, the productive capacity of petitioner from its creation until December 15, 1941, had very materially increased as a result an increased credit rating, increased plant capacity, increased number of employees and an increased stock pile of material. From the creation of the corporation through the fiscal year 1941-1942 the corporation paid no dividends and during the first five years*25 of its existence it paid but $48.85 as total income tax. In 1942 petitioner paid a total tax of $1,028.87, after taking a deduction of $59,500 as compensation to Cotton and Barnes. Up to February 28, 1942, petitioner had paid interest charges in the sum of $9,312.55. Opinion Petitioner contends that when the examiner made his original finding against the deductibility of more than $22,500 of the $59,500 salary expenditure authorized for the fiscal year 1941-1942, this petitioner filed a protest before the proper agent in charge, setting forth the facts on which the $59,500 appropriation was based, including the resolution of the directors which showed that $32,000 thereof in the case of Barnes and $14,000 thereof in the case of Cotton was for unusual services performed in years prior to February 1941. Petitioner then says that the Commissioner rejected said protest and explained his approval of the examiner's adjustments in the following terms: It has been determined that the deduction of $59,500.00 claimed on your return for compensation to officers for the taxable year ended February 28, 1942, is excessive to the extent of $37,000.00. It is held that the amount of $22,500.00*26 represents reasonable compensation for the services rendered by the said officers and the above amount of $37,000.00 has been disallowed as a deduction from income. Furthermore, amount of the alleged deduction has not been established. Since said explanation merely states that $22,500 represents reasonable compensation and does not discuss any allowance for extraordinary services in years prior to 1941, petitioner argues that the Commissioner made his determination under a mistaken concept of law, inasmuch as the Commissioner must have determined (according to the petitioner) that any payment in 1942 for services rendered prior to 1942 could not be accepted as allowable deductions in 1942. Therefore, the petitioner argues that the deficiency is founded on a faulty concept by the Commissioner and that therefore the presumption in favor of the Commissioner's finding does not pertain to this case; that the Commissioner must establish the correctness of his deficiency affirmatively by a preponderance of the evidence and, since the Commissioner did not introduce any witnesses at all he has wholly failed to establish such correctness by a preponderance of the evidence; and that therefore*27 petitioner's claimed deductible allowance must be supported because of the absence of proof to the contrary. Petitioner cites Acorn Refining Co., 2 B.T.A. 253, and other supporting cases. We can find no substance in petitioner's contention on this point. In the report of the Commissioner in which the deficiency is determined, the Commissioner specifically makes the following statement: In making this determination of your income, declared value excess profits and excess profits tax liability, careful consideration has been given to the report of examination dated May 31, 1944; to your protest executed August 14, 1944; and to the statements made at the conferences held on September 1, October 5, and 10, November 15 and 16, 1944. While it is true that the Commissioner might have made his determination in this case because of a mistaken interpretation of the law with reference to the deductibility of compensation for past services, nevertheless the Commissioner could also have based his finding on a factual determination that in this particular case no deduction for compensation for past services can be allowed because the facts show such compensation to be unreasonable. *28 This Court will not presume that the Commissioner was laboring under a mistaken concept of law when the record shows that he reviewed all the facts and thereafter determined as a matter of fact that compensation in this particular case on the facts would not be deductible. Therefore we approach a decision of this case with the assumption that the factual determination of the Commissioner is correct and that, based upon those facts, a compensation of $32,000 to Barnes and $14,000 to Cotton for extraordinary services rendered prior to 1941 is unreasonable and not allowable deductions in the fiscal year 1941-1942. There is no question from the record in this case but that both Barnes and Cotton were very efficient hard-working executives and that if the labors they performed from 1937 to 1941, inclusive, had been in a field of greater income possibilities, their efforts might well have deserved a higher reward than that which they actually received. However, the record shows in this case that each of these executives withdrew every penny of salary that the profits of the Commercial Iron Works would justify. They operated this company very largely on borrowed capital rather than on invested*29 capital and by this process Cotton received considerable additional interest at rates from six to eight percent on the money he lent to the petitioner. It is also evident that this petitioner, up to January 1, 1942, considered the services of Cotton and Barnes of practically the same value. In fact the resolution of December 15th votes each of them the same compensation for the last ten months of 1941 and, if we add to Cotton's compensation the interest which he received for money lent to petitioner corporation over the first four years of the life of petitioner corporation, the actual compensation of these two men, one of whom put in his experience in the steel fabricating business against the legal experience and the capital of the other, we will find that their compensation was almost identical. There would be no apparent reason therefor for compensating Barnes $32,000 and Cotton $14,000 for extra services for the four years time during which they had been compensated equally as the services were rendered. Of course, it is at once observable that the making of this compensation in unequal amounts avoids an embarrassing inference which would arise if two men owning the same amount*30 of stock were to be paid equal compensation under the guise of salaries. It is also worthy of note in this case that during the first four years of petitioner's existence neither Barnes nor Cotton considered themselves underpaid, nor did they have any idea of being compensated later on for extraordinary services. The following is an excerpt from the examination of Barnes by his own attorney at the hearing: Q. I am asking you, with respect to salaries for the years prior to the fiscal year ending February 28, 1942, which would be the year, the last year ending February 28, 1941 - whether during those prior years you set your salaries or the charges on the books for salaries on a basis which you determined to be adequate compensation for the work you had done? * * *A. I wouldn't say that we ever felt that they were either adequate or inadequate at the time. It would depend on what the circumstances were. I think we paid according to what we could afford to pay then and what our personal needs were at the time that we took any money out of the company at all. * * *Q. What agreement, if any, did you have with regard to paying yourselves additional compensation for those*31 years prior to the fiscal year ending '42 or before December 15, 1941? A. None. It is also interesting to note that the resolution of December 15, 1941, is worded in exactly the same phrases of the resolution of the board of directors in Lucas v. Ox Fibre Brush Co., 281 U.S. 115, and that by December 15th an exceptionally prosperous income year had been definitely established for the petitioner corporation and the prospects of continued good business were practically certain. Throughout the life of this company, through the use of borrowed, rather than invested capital, and the payment of executive's salaries, this company had avoided paying income tax. By December 15, 1941, however, it became obvious that unless exceptional steps were to be taken a substantial income tax would have to be paid for that year. To make the compensation of these two officers equal would be a rather obvious mistake to a competent lawyer who had the foresight to look up the case of Lucas v. Ox Fibre Brush Co., before he prepared the resolution. In addition to this there is one factor in this case which does not prevail in any of the cases cited to the Court by the petitioner, wherein large*32 salaries for services rendered prior to the tax year have been approved by the Tax Court, and that is that this resolution of December 15, 1941, and the steps taken thereafter were all steps in the liquidation of the Commercial Iron Works. In the cases where a generous compensation for past services has been approved as deductible, the taxpayer corporation has been a going concern and not a liquidating one as in the case at bar. It is one thing for a court to allow compensation for formative periods of growth when that growth results in future increased income, while it is entirely another, to permit compensation for the growth period, when the growth results in nothing but liquidation. The fact that this was a step in liquidation is evidenced from the manner of payment. But a relatively small amount of this back payment was actually paid in cash. By far the most of it was in promissory notes of sufficient size to cover the value of the tangible assets at the liquidation of the corporation which occurred on April 29, 1942. Therefore we are unable to find that any amount in excess of a reasonable compensation for the fiscal year ending February 28, 1942, would be allowable as a deduction*33 for past services to this particular petitioner when the petitioner was in immediate prospect of dissolution. Furthermore, there is considerable question about the bona fides of the resolution of December 15, 1941, as shown by the fact that there is no evidence in the record that any extra compensation was paid to Ira Palmer, who was supposed to have received $2,250, or to any of the other employees covered by the resolution. None of our conclusions in this discussion are reflections upon either Barnes or Cotton. They were merely taking such steps as they deemed available to keep their taxes as low as possible. They used the corporate form and procured its many advantages as long as they could do so without paying the income and excess profits taxes which that form necessitates. As soon as the corporate income increased beyond their capacity to absorb it, they took a step which they conceived to be perfectly legal to absorb that unexpended income and immediately planned to assume the partnership form of operating unit. We are not reflecting in any way on their motives. We are merely unable to approve their methods from a legal viewpoint. We also find that the allowance of a salary*34 deduction of $15,000 for Barnes and $7,500 for Cotton for the fiscal year ending February 28, 1942, allowed by the Commissioner is very generous under the facts in this case. This amount trebles the salary fixed by the petitioner for the previous year when the gross profits of the corporation were somewhat less than three times as great as the profits of the previous year, and when the gross sales were approximately twice the amount of the previous year. This salary, furthermore, is 24 percent of the gross profits. In 1940 the salary was 25 percent of the gross profits and in 1941 it was 21 percent of the gross profits. It is our conclusion therefore that the deficiencies found by the Commissioner must be sustained. Decision will be entered for the respondent.